# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 24, 2019

Lyle W. Cayce
Clerk

No. 18-30375

—————

BP EXPLORATION & PRODUCTION, INCORPORATED; BP AMERICA
PRODUCTION COMPANY; BP, P.L.C.,

Requesting Parties - Appellees

v.

CLAIMANT ID 100246928,

Objecting Party - Appellant

—————

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-1026

—————

Before JOLLY, COSTA, and ENGELHARDT, Circuit Judges.

GREGG COSTA, Circuit Judge:*

More than a hundred thousand businesses have filed claims with the Deepwater Horizon settlement program.[1] For some of these businesses, the April 2010 explosion and resulting oil spill's effect on their bottom line is obvious. Commercial fishing was not allowed in large portions of the Gulf of

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] *See* Public Statistics for the Deepwater Horizon Economic and Property Damages Settlement at http://www.deepwaterhorizoneconomicsettlement.com/docs/statistics.pdf.

Mexico during part of the cleanup. And anyone would recognize that the decline in beach tourism likely hurt hotels and restaurants near the coast.

But various types of businesses with more attenuated connections to conditions in the Gulf have also received compensation. Two examples are nonprofits and law firms. *See, e.g.*, *BP Expl. & Prod., Inc. v. Claimant ID 100237661*, 2019 WL 1511007 (5th Cir. April 5, 2019); *BP Expl. & Prod., Inc. v. Claimant ID 100204031*, 2019 WL 1281203 (5th Cir. Mar. 18, 2019). Even professional sports teams from Gulf Coast cities have sought money from BP. *See Claimant ID 100248748 v. BP Expl. & Prod., Inc.*, 2019 WL 1451309 (5th Cir. Mar. 20, 2019). This appeal involves one of those claims filed by the NFL's Tampa Bay Buccaneers. The team seeks $19.5 million.

The spill's impact on the Buccaneers may not be readily apparent. Disastrous though the April 2010 explosion was for significant areas of the Gulf and surrounding coast, it did not hurt the Buccaneers' performance that fall. The team went 10-6 after going just 3-13 the year before. The Bucs have not had a 10-win season since.[2]

But obtaining money from the Deepwater Horizon settlement program does not require showing a direct connection between the spill and the claimant's business. Instead of having to litigate causation in countless trials, BP agreed to determine eligibility largely based on whether a claimant's financial condition worsened after the spill. *In re Deepwater Horizon*, 744 F.3d 370, 376–77 (5th Cir. 2014). The settlement agreement essentially treats a post-spill decline in a business's profitability as circumstantial evidence of causation.

The agreement established four geographic "economic loss zones"— Zones A, B, C, and D. Claimants are treated more favorably the closer they

---

[2] PRO FOOTBALL REFERENCE, https://www.pro-football-reference.com/teams/tam/.

were to the spill. *See In re Oil Spill by Oil Rig "Deepwater Horizon"*, 910 F. Supp. 2d 891, 947–48 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014). Tampa is in Zone D, the zone furthest from the spill. As a result, unlike claimants closer to the spill, the Buccaneers had to meet a "causation" test that requires more than showing just a post-spill loss. The team claimed it satisfied the "V-Shaped Revenue Pattern" test. The "V" label refers to the claimant's need to show a reduction in revenue during the spill year (2010) followed by increased revenue the next year (2011). If revenue in the spill year is lower than in the surrounding years, the inference is that the spill caused that downturn. Moving from the rationale of the V-Shaped test to its specifics, a claimant must show: (1) a post-spill revenue downturn of 15% during a three-month period between May and December of 2010, and (2) a revenue upturn of 10% during the same three months in 2011.

The Buccaneers claimed that the team's May–July 2010 revenues showed the necessary dip from the prior year with a significant upturn in those same months the following year. Only the second part of the V-Shaped Test, the required upturn in 2011 numbers, is in dispute.

The numbers the team submitted allowed it to show the necessary increase in revenue from 2010 to 2011 because of a change in when it recorded "NFL Ventures" revenue, which refers to a share each team receives of certain NFL profits. In 2010, the Buccaneers recorded NFL Ventures revenue only in January and August–December, the months roughly comprising the NFL season. The team recorded no revenue from NFL Ventures during May–July 2010. But during that same May–July period in 2011, the Buccaneers did record NFL Ventures revenue. That difference has a huge impact on the V-Shaped test. Without the change (that is, if all the NFL Ventures revenue was recorded only during the season for both 2010 and 2011), the team would have suffered a disqualifying revenue downturn from May-June 2010 to May-June

2011. With the change, the team shows a nearly 500% upturn. That upturn gives the revenue the down-then-up shape of a V.

Recognizing the importance of the NFL Ventures receivable to the viability of the Buccaneers' claim, the program accountants asked the team to explain what changed from 2010 to 2011. The Buccaneers chalked the change up to the labor dispute that threatened the 2011 football season. The team told the accountants that, during the labor troubles, the NFL "provided guidance for us to record . . . NFL Ventures revenue for April, May, and June of 2011 in case there was a lockout." The Buccaneers then recorded the remainder of the year's NFL Ventures revenue during the season once "the lockout was lifted" in August. To support its explanation, the team submitted an affidavit from its controller, Christopher Denner, stating that in light of the prospects of a lockout, the NFL had "provided a NFL Ventures revenue forecast of amounts estimated to be earned during April 1, 2011–March 31, 2012," and that the team had recognized the revenue earlier than normal "[b]ased on this information." The team, however, never submitted financial statements or other evidence showing that it made and implemented this accounting decision during 2011 (as opposed to later when it learned of the requirements for a Deepwater Horizon claim). The only dated financial statements have an "as of" date of October 2014. Another (undated) set was created for purposes of the claim by an accounting firm that often works on BP claims with the Buccaneers' lawyers. There is nothing from the Buccaneers' regular accounting firm indicating that it decided in 2011 that the NFL Ventures revenue should be allocated differently.

The program accountants rejected the lockout justification for the 2011 change. They moved the NFL Ventures revenue recorded in May and June to August, "where the remainder of the amount was recorded during the course of the season." They reasoned that the lockout was lifted, allowing the season

to proceed "as normal," so it was appropriate to reallocate the revenue in a manner "consistent" with when the team had recorded NFL Ventures revenue in 2009 and 2010. Because moving the revenue meant the team failed the V-Shaped test, the Claims Administrator denied the claim.

The Buccaneers appealed the denial to a program Appeal Panel. The Appeal Panel acknowledged that the settlement agreement allows the Claims Administrator to reallocate revenue from one month to another to correct "errors." But it found that the threatened lockout meant that 2011 was "unique" and the team was justified in recording NFL Ventures revenue differently than it had in prior years. The Appeal Panel thus rejected the reallocation.

It was then BP's turn to appeal, and the district court granted its request for discretionary review. Contrary to the Appeal Panel, the district court found the Buccaneers' lockout explanation "not persuasive." The 2011 departure from the team's "established accounting practice" was thus an error the program accountants were authorized to correct. As a result, the district court reinstated the denial of the claim. The Buccaneers appeal that decision.

Challenges to the settlement program's claims decisions typically come to us after the district court denies a request for discretionary review. In those cases, we review only for abuse of discretion. *Claimant ID 100212278 v. BP Expl. & Prod., Inc.*, 848 F.3d 407, 410 (5th Cir. 2017). But this is one of the uncommon cases in which the district court reviewed a claims decision. In such circumstances, questions of law such as the interpretation of the settlement agreement are reviewed de novo, as is the ordinary rule. *Claimant ID 100081155 v. BP Expl. & Prod., Inc.*, 920 F.3d 925, 928 (5th Cir. 2019). We see no reason why the ordinary standard of review for questions of fact—we defer to the district court's findings unless they are clearly erroneous—should not

5

also apply. *See Ergon-West Virginia, Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 424 (5th Cir. 2013).

We do not see a basis for disturbing the district court's determination that the team erred in allocating some of its NFL Ventures revenue in 2011 to May and June. The Claims Administrator's Policy 495 defines "error" as "includ[ing], but not . . . limited to":

> duplicate accounting entries; debit entries recorded as credits or vice versa; mistakes in applying applicable accounting principles based on the claimant's method of accounting; oversights or misinterpretation of the facts; input or calculation errors; and/or postings to the incorrect revenue and/or expense categories.

The district court interpreted that definition as encompassing an unjustified departure from an established accounting practice.[3] We agree. Much of the definition relates to mistakes that sound akin to typos or similar oversights. But the definition also includes "mistakes in applying applicable accounting principles based on the claimant's method of accounting." What better indication of the claimant's method of accounting than how it historically recorded that revenue—that is, its established accounting practice? An unjustified departure from an established accounting practice is necessarily a mistake in applying that practice, and thus is an "error" warranting reallocation.

The questions then become whether the district court clearly erred in finding that (1) the Buccaneers' established accounting practice was to record NFL Ventures revenue only during the football season, and (2) the threat of a lockout did not justify departing from that practice in 2011.

---

[3] The team argues that, because the program accountants did not explicitly identify an error, they cannot have moved the revenue to fix an error. But we are reviewing the district court's findings, not the settlement program's. The district court did identify an error.

On the team's pre-2011 accounting practice, the record is not robust. The settlement agreement did not require the Buccaneers to submit profit and loss statements from before 2009, so there are only two years to consider prior to the 2011 allocations at issue.[4] But in both those years, the team recorded its NFL Ventures revenue from August to January (roughly comprising the football season). The one exception is March 2009, but as the settlement program's accountants explained, that was an accounting entry to true up a miscalculation of January 2009 revenue.[5]

Despite the small sample size, the district court reasonably found that the team had an established practice of recording NFL Ventures revenue during the season and not outside it. Looking just at the months relevant to the V-Shaped test (May–July), in neither 2009 nor 2010 did the team book NFL Ventures revenue during these months. And given that the the March 2009 entry was just a true up of a previous miscalculation, none of the twelve off-season months during 2009 and 2010 included NFL Ventures revenue. Indeed, by arguing that the threat of a lockout justified recording NFL Ventures revenue in May and June of 2011, the team essentially concedes that it ordinarily would not have recorded NFL Ventures revenue in those months.

So the dispute comes down to the legitimacy of the lockout justification. The Buccaneers fail to support it as a valid reason to deviate from its prior practice. The team relies solely on the affidavit of its controller and repeatedly misrepresents it as recounting a directive from the NFL that teams should book NFL Ventures revenue during the offseason. *See, e.g.*, Oral Arg. at 1:31–44 (claiming that NFL Ventures "directed" the team to accrue revenue as it

---

[4] For the reasons explained in the order denying the Buccaneers' request to seal the courtroom for oral argument, we will not seal this opinion but will omit revenue numbers. *See BP Expl. & Prod., Inc. v. Claimant ID 100246928*, 920 F.3d 209 (5th Cir. 2019).

[5] The team made a similar entry in March 2011, which it explained to the accountants was a true up for a miscalculation of January revenue.

did). Instead, the team controller says that "the NFL provided a NFL Ventures revenue forecast of amounts estimated to be earned during April 1, 2011–March 31, 2012." That explains how the team came up with its revenue numbers, not when it should have recognized the revenue (to say nothing of the absence from the record of the actual communication from the NFL). We see no reason why a "revenue forecast" meant that the team received or became entitled to receive revenue earlier in 2011 than in prior years. The district court's rejection of the lockout explanation was sound.[6]

\* \* \*

The district court's judgment is AFFIRMED.

---

[6] The team frames the reallocation of its 2011 NFL Ventures revenue as violating Policy 495's prohibition on finding errors based on hindsight. Had the district court offered the same explanation as the program accountants—that is, that it turned out the lockout did not extend into the season—there might be something to this argument (though perhaps not, given the team's offering no evidence that it made its allocation decisions before the lockout ended). But the district court found that the deviation was unjustified by the threat of a lockout, not that it became unjustified once the lockout ended.